# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00685-CV

**Appellants**, Southwest Texas HMO, Inc. d/b/a HMO Blue Texas and
Health Care Service Corporation, a Mutual Legal Reserve Company //
Cross-Appellants, Vista Health Plan, Inc. and IntegraNet Provider Organization, Inc.

**v.**

**Appellees, Vista Health Plan, Inc. and IntegraNet Provider Organization, Inc. //**
Cross-Appellees, Southwest Texas HMO, Inc. d/b/a HMO Blue Texas and
Health Care Service Corporation, a Mutual Legal Reserve Company

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. GN1-03928, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal stems from a dispute between appellants Southwest Texas HMO Inc. d/b/a HMO Blue Texas ("HMO Blue") and Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC"),[1] and appellees Vista Health Plan, Inc. ("Vista") and IntegraNet Provider Organization, Inc. ("IPO") concerning the administration of the state's Medicaid managed-care program. Under the Texas Medicaid program, the state contracted with HMO Blue, a managed-care organization, to provide comprehensive health care services to Medicaid-eligible recipients. HMO Blue, in turn, entered into a participating medical group agreement ("Agreement")

---

[1] Effective January 1, 2004, HMO Blue was merged into HCSC and no longer exists as a separate entity.

with Vista, a medical provider group, to provide Medicaid services to "designated members" within the Bexar County, Harris County, and Travis County service-delivery areas.[2] IPO, another medical provider group, later became a party to the Agreement by partial assignment in the same capacity as Vista (hereinafter, "Medical Group" or "Vista and IPO") to provide Medicaid services to designated members within the Harris County service-delivery area.

In 2001, a dispute arose between HMO Blue and Medical Group over whether Vista and IPO were legally obligated to pay the claims of a special class of patients—newborns weighing 1,200 grams or less at birth. Vista and IPO stopped providing funds for those patients and accused HMO Blue of paying between $10,000,000 and $12,000,000 in claims for ineligible Medicaid recipients. Vista and IPO sued HMO Blue, the Texas Department of Health, and other state agencies for declaratory and injunctive relief. They later filed suit against HMO Blue seeking damages for breach of contract and breach of fiduciary and statutory duties. HMO Blue counterclaimed for recovery of funds it expended as a result of Medical Group's alleged breach of contract. The trial court in 2002 dismissed the state agencies for lack of subject matter jurisdiction;[3] denied Vista's and IPO's motion for summary judgment on liability; granted partial summary judgment in favor of

---

[2] The Agreement, effective September 1, 1997, was titled "Participating Medical Group Agreement—Bexar, Harris and Travis County Service Delivery Areas (Texas Medicaid Managed Care Program) by and between HMO (as described herein) and Medical Group." Under the Agreement, "designated members" were those individuals residing in the service areas who were entitled to Medicaid benefits, were in a Medicaid eligibility category included in the state's managed-care program ("STAR"), enrolled with HMO Blue, and assigned to the Medical Group's physicians as the members' primary care physicians. The Agreement was terminated in 2001 but claims under the Agreement continued to be processed and paid through August 2002.

[3] This Court affirmed the trial court in *Vista Health Plan, Inc. v. Texas Health & Human Services Commission*, No. 03-03-00216-CV, 2004 WL 1114551 (Tex. App.—Austin 2004, pet. denied) (mem. op.).

2

HMO Blue on its counterclaim for breach of contract; and awarded HMO Blue $6,580,662.55 in damages and $20,000.00 in attorneys fees.

After HCSC was added as a defendant, HMO Blue and HCSC filed a motion for partial summary judgment in March 2005 as to Vista's and IPO's non-breach-of-contract claims, contending that they were entitled to summary judgment as a matter of law and based upon no-evidence grounds. *See* Tex. R. Civ. P. 166a(c), (i). The trial court granted the motion, leaving only Vista's and IPO's breach-of-contract claims to be determined. After a one-week trial in May 2005, the jury found HMO Blue had failed to comply with the Agreement and that its failure to comply was not excused. The jury found damages of "lost profits" for Vista in the amount of $10,806,250.70 and for IPO in the amount of $4,631,250.30. The court thereafter entered judgment on the jury verdict, awarding Vista $10,806,250.70 and IPO $4,631,250.30 in damages, plus attorney's fees, court costs, and postjudgment interest at the rate of six percent. The court also incorporated into the judgment the partial summary judgment previously granted to HMO Blue in 2002, awarding HMO Blue $6,580,662.55 in damages and $20,000.00 in attorney's fees, plus interest at the rate of ten percent per annum, compounded annually, on those sums from November 14, 2002, the date of the summary judgment ruling. These appeals followed.

In four issues, HMO Blue and HCSC argue that evidence of causation and lost profits for Vista and IPO is legally and factually insufficient or, in the alternative, the evidence is legally and factually insufficient to support the amount of lost profits found by the jury. Vista and IPO raise three issues in their cross-appeal, contending insufficient summary judgment evidence of HMO Blue's damages, error in the trial court's granting of partial summary judgment for HMO Blue and

HCSC on the Medical Group's fraud and fiduciary duty claims, and error in the court's awarding of postjudgment interest to HMO Blue from the date of the 2002 partial summary judgment. For the following reasons, we modify the judgment and affirm the judgment as modified.

## DISCUSSION

*Background*

The Agreement was a "full risk" contract. Vista and IPO were paid on a per patient or "capitation" basis, defined in the contract as "a payment system which pays to Medical Group a fixed actuarially determined amount per month . . . for each Designated Member for the provision of Covered Health Services—in lieu of fee-for-service payments." Under a capitation payment system, the health care provider receives from the payor a flat payment per member, per month. *See* Michael A. Cassidy, Shana Siegel, "Physician Contracts," in 1 *Treatise on Health Care Law*, 2-1, § 2.04 [2] ("Risk Contracting"), 2-50 (Matthew Bender, rev. ed. 2010). In exchange for this monthly capitation payment, the health care provider agrees to provide all of the required medical services as defined in the provider agreement. *Id.* Rather than being paid on the number and type of services provided (that is, fee-for-service), the health care providers are paid based on the number of members or enrollees within the plan, regardless of the nature or extent of utilization. *Id.*

Under its full-risk contract with the state, HMO Blue received a monthly capitation payment from the state. From those payments, pursuant to the terms of the Agreement, HMO Blue retained 14 percent and paid 75 percent to Vista for the health care of its 23,000 to 25,000 members. Vista then paid a portion of those amounts to IPO for the health care of the members in Harris County. Under the Agreement, HMO Blue was responsible for claims adjudication and processing.

4

It adjusted, settled, and paid claims out of a bank account funded by Vista. Medical Group bore the risk that the fixed capitation payment they received monthly from HMO Blue on a per-member basis might not be sufficient to cover that member's medical needs for any given month. Martha Alikacem, former vice-president of HMO Blue's Medicaid division, testified Vista realized a profit if the cost of the members' health care for any given month was *less* than the capitation payment; however, if the monthly capitation payment was insufficient to cover the expenditures for the members' health care, Vista had to cover those costs.

### HMO Blue's and HCSC's Issues

#### Standard of Review

In each of their four issues, HMO Blue and HCSC challenge the sufficiency of the evidence to support the jury's verdict. In reviewing a verdict for legal sufficiency, the Court must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005)). Every reasonable inference must be indulged in the prevailing party's favor. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex. 2002). Legally insufficient evidence or "no evidence" exists when the record reveals one of the following: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the

5

opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810; *C. C. Carlton Indus. Ltd. v. Blanchard*, 311 S.W.3d 654, 659 (Tex. App.—Austin 2010, no pet.).

In reviewing an assertion that the evidence is factually insufficient, this Court must consider all the evidence in the record, including any evidence contrary to the judgment. *Plas-Tex., Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). Inferences may support a judgment as long as they are reasonable in light of all the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). A jury verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986 (Tex. 1986) (per curiam); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985).

### *Evidence of Causation*

HMO Blue and HCSC do not challenge the jury's findings that HMO Blue breached the Agreement and that its failure to comply was not excused.[4] Their issues address the jury's finding of damages. In their fourth issue, HMO Blue and HCSC argue that the evidence was legally and factually insufficient for the jury to find a causal link between the Medical Group's damages and HMO Blue's breach of the Agreement. HMO Blue and HCSC assert that Vista's treasurer, Ernest Perales, "purported to testify that Vista sustained damages as a result of HMO Blue not providing sufficient data to Vista under" the Agreement. Yet, HMO Blue and HCSC contend, the

---

[4] In Question 1, the jury was asked, "Did HMO Blue fail to comply with the [Agreement]?" The jury answered "yes." In Question 2, the jury was asked, "Was HMO Blue's failure to comply excused?" The jury answered "no."

6

event that caused the Medical Group's damages was either Vista's breach of the Agreement or HMO Blue's legal termination of the Agreement.

Vista and IPO respond the evidence was legally and factually sufficient for the jury to find causation. They argue, "The provisions of the [Agreement] regarding access and the breach of those provisions was simply the tip of the iceberg and the manner in which HMO Blue attempted to hide the other, larger, breaches." They assert the record contains sufficient evidence that the Medical Group was damaged by HMO Blue's failure to make certain payments to Vista that HMO Blue was contractually obligated to make and by HMO Blue's disbursement of funds out of Vista's bank account for claims HMO Blue had a contractual obligation not to pay. We agree.

Perales testified that HMO Blue breached the Agreement by failing to "back out" claims Vista had to fund for patients who, because it was determined they qualified for Supplemental Security Income ("SSI"),[5] no longer were eligible for Medicaid and thus could not be "designated members" as defined in the Agreement. Both Perales and Jim Cannedy, Vista's chief financial officer, described how, during a six-month period, HMO Blue failed to pay Vista supplemental delivery payments[6] totaling approximately $2.3 million. Cannedy stated that, as a result of it not getting timely supplemental delivery payments, Vista had to continually fund claims out of its reserves while one or two million dollars in revenue was not being received from HMO Blue.

---

[5] Perales explained that some disabled individuals become eligible for SSI, which "provides long-term care for the individual and long-term support for the family, because it involves other federal programs that pay for different things that the regular Medicaid program does not pay for."

[6] Beginning in June 2000, the supplemental delivery payment program was implemented, wherein Medical Group was to receive, "upon delivery," a supplemental payment of $2,422.62 for each delivery of a newborn. This supplemental payment was intended to reimburse Medical Group for paying hospital claims for deliveries.

7

Janet Monteros, Vista's chief operating officer and general counsel, described how HMO Blue failed to comply with the Agreement. She testified HMO Blue did not provide sufficient eligibility and financial data for Vista to assess its risk in providing medical care for particular enrollees.[7] She also stated that Vista did not receive information about changes in the program that severely impacted Vista's ability to manage its medical care program. Monteros contended HMO Blue failed to investigate claims and pursue third-party recovery as it should have and improperly paid SSI claims, that is, claims for blind and disabled enrollees, out of Vista's bank account.[8] She further described how Vista paid the claims for deliveries at the time they occurred; yet, it had to wait for up to six months for HMO Blue to send it the supplemental delivery payments. Thus, she concluded, Vista was turned into a banker for HMO Blue by providing it the capital financing for the supplemental delivery payments program. Monteros pointed out that, even though Vista did not have contracts with the hospitals and never knew what the rates were, it remained responsible for paying the hospitals.

---

[7] In order to determine whether a risk contract is profitable, or at least acceptable, health care providers must utilize cost-accounting methodologies that are sophisticated enough to enable the providers to determine whether they are actually profiting or at least covering overhead expenses on services provided. Michael A. Cassidy, Shana Siegel, "Physician Contracts," 1 *Treatise on Health Care Law*, 2-1, § 2.04 [4] ("Risk Contracting"), 2-5 (Matthew Bender, rev. ed. 2010). The Agreement obligated HMO Blue to maintain a suitable medical management information system. Perales testified that, in order to project what Vista's income needs would be, it needed data on what kinds of cases were being handled and, especially, data on what particular cases were costing Vista a lot of money. Perales stated that HMO Blue provided Vista very limited information, restricting it to only certain categories.

[8] Monteros pointed out that the blind and disabled enrollees had a "separate pot" of federal funds for their claims and long-term care, whereas the STAR program was essentially a preventive health care plan.

Viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we hold the evidence legally sufficient to support the jury's finding that HMO Blue's breach of the Agreement caused Vista and IPO to suffer damages. Considering all the evidence and inferences in the record, we hold the evidence factually sufficient and the jury verdict not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. HMO Blue's and HCSC's fourth issue is overruled.

### *Evidence of Vista's and IPO's Lost Profits*

In their first, second, and third issues, HMO Blue and HCSC challenge the sufficiency of the evidence to support the jury's award of "lost profits" damages. Quoting *Springs Window Fashions Division, Inc. v. Blind Maker, Inc.*, they argue that the lost-profits evidence was legally and factually insufficient to support the jury's award:

> When determining whether legally and factually sufficient evidence of past consequential lost profits damages supports the jury's award, we are mindful of several important standards governing the manner in which lost profits must be proven under Texas law. First, lost profits, by definition, must be *profits* and should not be confused with economic gains or losses that are a mere component of a lost profits calculation or with other types of economic harm that may be compensable through different damage elements. Lost profits are damages for the loss of *net* income to a business, and, broadly speaking, reflects income from lost business activity less expenses that would have been attributable to that activity.

9

184 S.W.3d 840, 883-84 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.) (emphasis in original) (citations omitted).[9] HMO Blue and HCSC contend that the amount of lost profits was not "predicated on one complete calculation," shown by competent evidence with "reasonable certainty," or based on objective facts, figures, or data from which the amount of lost profits could be ascertained. *See id*. at 884.

HMO Blue and HCSC assert that the only "evidence" of any lost profits was provided by Perales who testified Vista lost about $4.8 million during the four years following termination of the Agreement[10] and another projected $2 million during the same period based on new contracts Vista had hoped to obtain, and that this testimony does not constitute evidence of recoverable lost profits. They contend that Perales's calculation of lost profits was not one complete calculation, was unsupported by objective data or figures, and was not shown by "competent evidence with reasonable certainty." *See id.* HMO Blue and HCSC further urge, "Vista had a history of unprofitability and no realistic expectation of becoming profitable." As for IPO's damages, HMO Blue and HCSC argue IPO presented no evidence of its lost profits. By seeking to limit our review

---

[9] In *Springs Window Fashions*, the plaintiff sought *consequential* damages, that is, those arising from business opportunities the plaintiff lost because of defendant's fraud. *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 883 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.). In contrast, Vista and IPO sought direct damages from HMO Blue and HCSC that resulted from breach of the Agreement. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *Arthur Andersen & Co v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *Id*. Consequential damages result naturally but not necessarily from a defendant's wrongful acts; they must be the foreseeable result of the wrong and must be directly traceable to it. *Id*.

[10] The contract was terminated in 2001. Perales stated Vista projected an average *net* profit of $1.2 million annually.

10

of the evidence of lost profits to Perales's testimony, HMO Blue and HCSC equate lost profits with lost future net profits.

The measure of lost profits for breach of a contract generally is lost net profits, but this measure is not limited to future lost profits after the contract is terminated. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992); *Springs Window*, 184 S.W.3d at 884. Net profit under a contract is defined as the difference between the sum the injured party was to receive less the expenses that the injured party would have incurred had it performed. *See Springs Window*, 184 S.W.3d at 884; *see also* State Bar of Tex., Texas Pattern Jury Charges-Business, Consumer, Insurance, Employment PJC 115.3, explanatory note (2008) (loss of contractual profit is "difference between the agreed price and the cost [injured party] would have incurred" in completing obligations under contract). Further, HMO Blue and HCSC have not challenged the damages question and instruction to the jury, and they did not seek an instruction defining the phrase "lost profits."

In this context, we review the sufficiency of the evidence based upon the charge as given to the jury. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 762 (Tex. 2003); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Question 3 inquired of the jury:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, that resulted from such failure to comply?
>
> Do not add any amount for interest on damages, if any.
>
> Do not include in your answer any amount that you find Plaintiffs could have avoided by the exercise of reasonable care.
>
> Answer separately in dollars and cents for damages, if any.

11

Consider the following elements of damages, if any, and none other:

    a.      Lost Profits

Lost profits are those which are a natural, probable and foreseeable consequence of HMO Blue's failure to comply.

    1. For Vista   ANSWER: $_____

    2. For IPO    ANSWER: $_____

The charge does not define "lost profits," and the jury was instructed to give the term its "commonly understood" meaning.[11] "Profit" has been defined as "an advantageous gain or return, benefit." American Heritage Dictionary 1045 (1973). That same dictionary defines profit as the "return received on a business undertaking after all operating expenses have been met." *Id*. Without an

---

[11] The instruction concerning lost profits tracks the pattern jury charge instruction for consequential damages. *See* State Bar of Tex., Texas Pattern Jury Charges-Business, Consumer, Insurance, Employment PJC 115.4 (2008). Profits lost on the actual breached contract are direct damages, while profits lost on other contracts and business relationships are consequential damages. *See Cherokee County Cogeneration Partners, v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist,] 2009, no pet.); *Continental Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 475 (Tex. App.—Eastland 2003, no pet.).

Even if we were to conclude that the trial court erred by only including the element of lost profits as the measure of damages, Vista and IPO have not waived complaint that the trial court erred by failing to include an instruction on direct damages. *See Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988). Vista and IPO sought and were refused the following instruction on direct damages:

Direct damages are those which naturally and necessarily flow from a wrongful act, and are so usual an accompaniment of the kind of breach alleged that the mere allegation of the breach gives sufficient notice.

Although this issue has not been waived, we need not address it given our conclusion that the evidence is sufficient to support the amount of lost profit damages awarded under the charge as given to the jury.

instruction or definition, the jury could rely on either of these common and ordinary meanings of the term "profit" in determining the amount of damages that were "a natural, probable and foreseeable consequence of HMO Blue's failure to comply."

Turning to the evidence, HMO Blue and HCSC focus on the portion of Perales's testimony concerning future lost profits after the Agreement was terminated. Viewing the evidence in the light most favorable to the verdict, however, the evidence supports the damage award without including any amount for future lost profits after the Agreement terminated. Further, the amount of damages awarded was based upon a complete calculation, shown by competent evidence with "reasonable certainty," and based on objective data and figures. *See Springs Window*, 184 S.W.3d at 884.

Perales testified concerning—and other evidence showed—the specific amounts that should have been paid to Vista and IPO during the period that the parties were operating under the Agreement.[12] The specific amounts, totaling over $15 million, were matched to the particular instances in which HMO Blue failed: (i) to pursue reimbursement from third parties of medical fees paid by Vista and IPO; (ii) to reimburse Vista and IPO for medical fees expended on behalf of persons who had applied for and received approval to be covered by other governmental programs;

---

[12] Perales testified:

> Q. What is the total amount of damages that Vista is asking for from HMO Blue?
> A. 47 million.
> Q. A lot of your calculations have been based on a period of four years. Why did you arrive at that period?
> A. That is the time period that we have been involved with them, with this dispute.

13

(iii) to reimburse Vista and IPO for the usage of their network; and (iv) to apportion and pass through monies owed Vista and IPO as refunds, supplementals, or capitation payments. The evidence also showed that HMO Blue made payments out of Vista's bank account that should not have been paid under the Agreement prior to the Agreement's termination.

In addition to Perales's testimony, exhibits documenting these amounts were admitted into evidence and Cannedy testified concerning this documentary evidence. The exhibits, including Plaintiffs' Exhibits 84, 85A-C, and 87, itemized amounts that totaled over $15 million with detailed back-up data that included specific dates, amounts, and the members involved. Cannedy described the damages, set forth in Plaintiffs' Exhibits 84, 85A-C, and 87, that resulted from HMO Blue's failure to comply with the Agreement. Cannedy testified that Vista's and IPO's damages included, among others, amounts HMO Blue paid out of Vista's funds for claims from an inappropriate assignment to Vista for the "R" twins and an inappropriate Medicaid eligibility classification for the "U" infant; claim payments HMO Blue made on SSI eligible members; an additional premium or capitation payment due Vista and IPO from the September 30, 2001, change in rates; refunds from claims paid by HMO Blue; non-reimbursed delivery payments (essentially, supplementary delivery payments); and reimbursement for HMO Blue's unauthorized use of Vista's medical-provider network after termination of the Agreement. Cannedy further testified that HMO Blue's actions caused Vista to suffer a severe drainage of its reserves that were necessary to pay claims and that Vista was seeking out-of-pocket damages to replenish its reserves. The jury also heard Alikacem describe how Vista made a profit only if the members' health care for any given month was *less* than

14

the capitation payment, but if the payment was insufficient to cover the members' care, Vista had to cover those medical costs.

Concerning IPO's damages, Paul Tovar, Vista's president and chairman of the board of directors, described the relationship between Vista and IPO. He testified that, when Vista went to Houston, "the area group asked that we help them go into the Houston area and develop a network," and that the Texas Department of Insurance suggested Vista "form this IPO, a nonprofit group, to work the same way as a HMO, to be able to go [into] the area." Tovar stated Vista was the administrator for IPO, authorized to apportion the capitation payments from HMO Blue between the two medical provider groups and to retain one-and-a-half percent of those payments for its efforts. He further testified that, based on the number of members in each of the three service-delivery areas, Vista was entitled to two-thirds of the damages and IPO to one-third. Consistent with his testimony, Exhibit 87 divided the specific itemized amounts of damages sought as between Vista and IPO.

The "universal rule" for measuring damages for breach of contract is just compensation for the loss or damage actually sustained. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 187 (Tex. App.—Austin 1998, pet. denied). Although Vista and IPO labeled categories of damages that they were seeking "out of pocket" and "offsets," their labels do not preclude their damages from falling within the common meaning of "lost profits . . . which [were] a natural, probable and foreseeable consequence of HMO Blue's failure to comply." *See Golden Eagle Archery*, 116 S.W.3d at 773-74 (in sufficiency review, "a court of appeals should consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages"). Given the nature of the parties'

15

contractual relationship, the evidence showed that Vista and IPO incurred operating expenses and paid claims during the time period that the parties were operating under the Agreement. Even if "lost profits" then is defined as lost net profits under the Agreement, the jury could have found that there were no expenses to deduct against the amounts sought—i.e., the payments, refunds, and reimbursements that Vista and IPO should have received during the period that the parties were operating under the Agreement. Further, the amount awarded is consistent with the general measure of damages for breach of contract: Vista and IPO have been compensated for damages that they actually sustained. *See Phillips*, 820 S.W.2d at 788.

The exhibits with itemized amounts that were supported by back-up data that included specific dates and amounts were "objective facts, figures, or data from which the amount of lost profits may be ascertained." *See Springs Window*, 184 S.W.3d at 884. The jury could have credited this evidence and found that those amounts were "lost profits . . . which [were] a natural, probable and foreseeable consequence of HMO Blue's failure to comply." Contrary to HMO Blue's and HCSC's assertions, and viewing the evidence in the light most favorable to the verdict, we hold the evidence legally sufficient to support the jury's award of $10,806, 250.70 to Vista (70 percent of the total $15,437,501 award) and $4,631,250.30 to IPO (30 percent of the total award). Further, considering all the evidence and inferences in the record, we hold the evidence factually sufficient and the jury verdict not so contrary to the overwhelming weight of the evidence as to be clearly wrong. HMO Blue's and HCSC's first, second, and third issues are overruled.

***Vista's and IPO's Cross-Appeal Issues***

***Evidence of HMO Blue's Damages***

As a conditional cross-appeal issue, Vista and IPO argue there was insufficient evidence for the trial court to grant summary judgment in favor of HMO Blue and HCSC and to award HMO Blue damages in the amount of $6,580,662.55. Vista and IPO assert this issue only in the event this Court determines that evidence of causation and Vista's and IPO's damages is insufficient. Having held that Vista's and IPO's evidence is legally and factually sufficient, we need not address Vista's and IPO's conditional cross-appeal issue.

***Medical Group's Fiduciary Duty and Fraud Claims***

Vista and IPO contend the trial court erred in granting HMO Blue's and HCSC's motion for summary judgment as to Vista's and IPO's fiduciary duty and fraud claims. In their motion, HMO Blue and HCSC argued that there was no fiduciary relationship between the parties as a matter of law or, alternatively, there was no evidence of a fiduciary relationship, that HMO Blue breached a fiduciary duty, or that a breach caused damage to Vista and IPO. *See* Tex. R. Civ. P. 166a(c), (i). HMO Blue and HCSC further sought summary judgment as a matter of law and based upon no-evidence grounds with respect to Vista's and IPO's common law fraud claims, asserting that there was no evidence raising material fact issues to support common law fraud for nondisclosure or misrepresentation. Their summary judgment evidence included the Agreement, the contract between the state and HMO Blue, and an affidavit of Martha Alikacem. Vista and IPO responded to the motions with evidence that included deposition excerpts from Cannedy.

17

We review the trial court's decision to grant summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a summary judgment motion pursuant to rule 166a(c), the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). A party seeking a no-evidence summary judgment pursuant to rule 166a(i) must assert that "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact" on the challenged element. *Id.*; *see Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581-82 (Tex. 2006).

In deciding whether there is a disputed material fact issue precluding summary judgment, we must take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Mack Trucks*, 206 S.W.3d at 582; *Dorsett*, 164 S.W.3d at 661. Where the trial court does not specify the grounds for its summary judgment, as is the case here, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

As to their fiduciary duty claims, Vista and IPO argue HMO Blue was a statutorily defined third-party administrator that owed Vista and IPO both a statutory fiduciary duty under the insurance code and a common law fiduciary duty. In response, HMO Blue denies it was a third-party administrator to Vista and IPO. However, assuming it was, HMO Blue, citing *National*

18

*Plan Administrators, Inc. v. National Health Insurance Co.*, points out the supreme court rejected Vista's and IPO's argument that HMO Blue owed Medical Group a statutory fiduciary duty. We agree. In that case, the court held that the insurance code does not create a general fiduciary duty applicable to third-party administrators. *See National Plan Adm'rs, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 701 (Tex. 2007). Rather, the court credited the Legislature with presuming that parties to a written agreement, especially parties in a commercial setting bargaining in their own self interest, set out their respective duties, obligations, and expectations in the agreement. *Id.*

Whether a common law fiduciary duty exists is a question of law. *Id.* at 700. Common law agency principles may be limited contractually, and a contractual obligation generally does not give rise to a fiduciary duty. *Id.* at 702. In this case, the Agreement provided that the parties were independent contractors and none of them was to be construed as the agent or representative of the other. We hold the trial court did not err in granting summary judgment as to Vista's and IPO's fiduciary duty claims.

Vista and IPO also argue that the trial court erred in granting summary judgment as to their fraud claims. A person commits fraud if he makes a false, material misrepresentation that he either knows to be false or asserts recklessly without knowledge of its truth with the intent that it be acted upon, and the person to whom the misrepresentation is made acts in reliance upon it and is injured as a result. *Bradford v. Vento*, 48 S.W.3d 749, 754-56 (Tex. 2001); *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied). A misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose. *Vento*, 48 S.W.3d at 755; *Miller*, 142 S.W.3d at 345.

19

Vista and IPO contend that HMO Blue had a contractual duty to disclose information about the manner in which HMO Blue handled Vista's funds. They further allege there was evidence that HMO Blue made representations with intent to deceive and with no intention of performing as represented, and evidence that HMO Blue took steps to hide the effect of its actions. HMO Blue and HCSC counter that there was no summary judgment evidence that HMO Blue made any misrepresentations, had knowledge of any falsity, or acted recklessly as to truth or falsity.

After reviewing the summary judgment evidence and taking as true all evidence favorable to Vista and IPO, indulging every reasonable inference, and resolving any doubts in their favor and given the parties' contractual relationship, we find no evidence that created a fact issue to preclude summary judgment on the fraud claims. We hold that the trial court did not err in granting summary judgment as to Vista's and IPO's fraud claims. Vista's and IPO's second cross-appeal issue is overruled.

*Postjudgment Interest*

In their third cross-appeal issue, Vista and IPO assert the trial court erred in determining that HMO Blue and HCSC were entitled to ten percent interest running from November 14, 2002, the date the court granted partial summary judgment in favor of HMO Blue on its counterclaim for breach of contract. Vista and IPO point out the trial court's decision was a partial summary judgment that was neither severed nor final but was, instead, incorporated into the 2005 final judgment at the request of HMO Blue. Citing *Columbia Medical Center of Las Colinas*

20

*v. Bush ex. rel. Bush*, Vista and IPO argue the interest rate on the partial summary judgment should have been six percent interest running from July 25, 2005, the date the judgment became final:

> . . . [G]iving the statutory language its plain meaning, the [2003] amendments to finance code section 304.003(c) apply to cases where a judgment is signed on [or] after the effective date of the Act and to cases where a judgment becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act.

122 S.W.3d 835, 864-66 (Tex. App. — Fort Worth 2003, pet. denied).

HMO Blue and HCSC concede the language of section 304.003(c) of the finance code and its legislative history indicate the 2003 amendments apply to the rate of postjudgment interest from the date of the final judgment forward. Relying on *Dallas Bank & Trust Co. v. Commonwealth Development Corp.*, HMO Blue and HCSC argue section 304.003(c) does not affect HMO Blue's right to ten percent interest from November 14, 2002, through July 24, 2005, the day before the final judgment. *See* 686 S.W.2d 226, 235 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) (summary judgment, though not final for appeal purposes, fixed Bank's liability).

In response, Vista and IPO correctly observe that *Dallas Bank and Trust* concerned a summary judgment that was severed because it fixed the amount of the bank's liability and all issues as to Commonwealth Development were resolved. In the instant case, however, Vista and IPO assert the issue is whether it was error to award postjudgment interest on an award of damages to one party (HMO Blue) before the breach-of-contract damages due the other parties to the contract (Vista and IPO) had been deducted by way of off-set. They argue that, until all off-sets had been deducted, HMO Blue's damage calculations could not be final.

21

The Legislature in 2003 rewrote section 304.003(c) ("Judgment Interest Rate") of the finance code. Section 6.04, article 6, chapter 204, of Acts of 2003 reads as follows:

> The changes in law made by this article apply in any case in which a final judgment is signed or *subject to appeal* on or after the effective date [September 1, 2003] of this Act.

Act of June 11, 2003, 78th Leg., R.S., ch. 204, art. 6, § 6.04, 2003 Tex. Gen. Laws 847, 862 (emphasis added). Also, chapter 676, section 2(a), of Acts of 2003 relating to the postjudgment interest rate and amending section 304.003(c), states the following:

> The changes in law made by this Act apply in a case in which a final judgment is signed or *subject to appeal* on or after the effective date [June 20, 2003] of this Act.

Act of June 20, 2003, 78th Leg., R.S., ch. 676, § 2(a), 2003 Tex. Gen Laws 2096, 2097 (emphasis added).

The phrase "subject to an appeal" when used to describe a judgment means the judgment fully and finally disposes of all parties and all issues before the trial court and therefore is capable of being appealed. *Columbia Med. Ctr.*, 122 S.W.3d at 865. In this case, the 2002 partial summary judgment did not fully and finally dispose of all issues and parties before the trial court and, therefore, was incapable of being appealed. Only after the final judgment was signed on July 25, 2005, was this case capable of being appealed. The judgment having been signed after the effective date of the amendments to section 304.003(c), the rate of six percent postjudgment interest applied to the final judgment as well as the summary judgment incorporated within. Thus,

22

the trial court erred in granting HMO Blue ten percent interest on its damages running from November 14, 2002, the date the court granted partial summary judgment in favor of HMO Blue on its counterclaim. Vista's and IPO's third cross-appeal issue is sustained.

## CONCLUSION

Because we conclude that the trial court erred in awarding interest in favor of HMO Blue from the date of the partial summary judgment, we modify the judgment to delete the award of interest from November 14, 2002, to the date of the final judgment. We further modify the judgment to reflect an award of postjudgment interest at the rate of six percent to HMO Blue on its damages awards from the date of the final judgment. As modified, the judgment is affirmed.[13]

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear
   Chief Justice Law not participating

Modified and, as Modified, Affirmed

Filed: October 28, 2010

---

[13] Because former Chief Justice Law was originally assigned to author this opinion, authoring duties were reassigned.

23